ANDREW J. THOMAS (State Bar No. 159533)
  ajthomas@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Telephone:  (213) 633-6800
Facsimile:   (213) 633-6899

ELIZABETH A. McNAMARA (*admitted pro hac vice*)
  lizmcnamara@dwt.com
CHRISTOPHER J. ROBINSON (*admitted pro hac vice*)
  chrisrobinson@dwt.com
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 603-6437
Facsimile:   (212) 489-8340

Attorneys for Defendants
STEPHENIE MEYER; LITTLE, BROWN AND
COMPANY; HACHETTE BOOK GROUP, INC.;
and MEGAN TINGLEY BOOKS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN SCOTT, an individual,<br><br>                      Plaintiff,<br><br>           vs.<br><br>STEPHENIE MEYER, an individual; LITTLE, BROWN AND COMPANY, a division of HACHETTE BOOK GROUP, USA, INC., HACHETTE BOOK GROUP, INC. a Delaware Corporation; MEGAN TINGLEY BOOKS, a business entity of unknown form, and, DOES 1 through 10, inclusive,<br><br>                      Defendants. | Case No.  CV 09-6076 ODW (RZx)<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:    November 9, 2009<br>Time:    1:30 p.m.<br>Ctrm:    11<br><br>[Defendants' Request For Judicial Notice and Declaration Andrew J. Thomas with Exhibits A and B, and Defendants' Notice of Lodging, Filed Concurrently] |

MOTION TO DISMISS PLAINTIFF'S COMPLAINT

TO PLAINTIFF AND HER ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on November 9, 2009, at 1:30 p.m. or as soon thereafter as the matter may be heard before the Honorable Otis D. Wright II of the United States District Court for the Central District of California, located at 312 North Spring Street, Los Angeles, California 90012, defendants Stephenie Meyer, Little Brown and Company, Hachette Book Group, Inc. (sued under its own name and under the name Hachette Book Group USA, Inc.) and Megan Tingley Books (collectively the "Named Defendants") will and hereby do move to for an order dismissing the Verified Complaint filed by plaintiff Jordan Scott, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This Motion is made on the grounds that the Verified Complaint fails to state a claim on which relief may be granted because no reasonable jury could conclude that defendants' work *Breaking Dawn* is substantially similar to plaintiff's work *The Nocturne* in its protectable expression under copyright law.

The Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Request for Judicial Notice and Declaration of Andrew J. Thomas with Exhibits A and B, all pleadings and records on file in this action, and upon other such evidence and argument as may be presented to the Court at the hearing on the Motion.

///

///

///

///

MOTION TO DISMISS PLAINTIFF'S COMPLAINT
DWT 13429832V1 3930170-000020

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on and after August 27, 2009.

DATED:  October 8, 2009

DAVIS WRIGHT TREMAINE LLP
ELIZABETH A. MCNAMARA
ANDREW J. THOMAS
CHRISTOPHER J. ROBINSON

By: ___/s/Andrew J. Thomas_____
                    Andrew J. Thomas

Attorneys for Defendants
STEPHENIE MEYER, LITTLE, BROWN AND COMPANY; HACHETTE BOOK GROUP USA, INC.; HACHETTE BOOK GROUP, INC.; and MEGAN TINGLEY BOOKS

2

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

I.  STATEMENT OF FACTS ..................................................................... 2

    A.  THE TWO WORKS ..................................................................... 2

        1.  *BREAKING DAWN* BY STEPHENIE MEYER ............. 3

            a.  The *Twilight* Series ......................................... 3

            b.  *Breaking Dawn* ................................................ 4

        2.  *THE NOCTURNE* BY JORDAN S. SCOTT ................... 5

II.  ARGUMENT ........................................................................................ 5

    A.  THE APPLICABLE STANDARDS ......................................... 5

    B.  PLAINTIFF HAS FAILED TO ALLEGE LITERAL COPYING ........................................................................ 8

    C.  NONE OF THE ALLEGEDLY SIMILAR ELEMENTS ARE PROTECTABLE AND, EVEN IF THEY WERE, THEY ARE DISSIMILAR IN EXPRESSION ..................................................................... 11

        1.  Plot and Themes ................................................... 11

        2.  Settings and Character ......................................... 15

        3.  Pace, Mood and Dialogue .................................... 18

        4.  Total Concept and Feel ......................................... 20

CONCLUSION ................................................................................................ 21

MOTION TO DISMISS PLAINTIFF'S COMPLAINT
DWT 13429832V1 3930170-000020

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF AUTHORITIES

Page

**Cases**

*A&M Records v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ..................................................................21

*Apple Computer, Inc. v. Microsoft Corp.*,
   35 F.3d 1435 (9th Cir. 1994) ............................................................. 7, 20

*Beal v. Paramount Pictures Corp.*,
   20 F.3d 454 (11th Cir. 1994) ...................................................................13

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) ..................................................... 8, 12, 13

*Branch v. Tunnell*,
   14 F.3d 449 (9th Cir. 1994) ....................................................................2, 8

*Capcom Co. v. The MKR Group, Inc.*,
   2008 U.S. Dist. LEXIS 83836, * 9-10 (N.D. Cal. Oct. 10,
   2008) .............................................................................................. passim

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ............................................................ 7, 8, 12

*CDN Inc. v. Kapes*,
   197 F.3d 1256 (9th Cir. 1999) ....................................................................6

*Chase-Riboud v. Dreamworks, Inc.*,
   987 F. Supp. 1222 (C.D. Cal. 1997) ...........................................................6

*Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd.*,
   697 F. Supp. 1136 (E.D. Cal. 1987) ...........................................................6

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
   499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).......................7

*Funky Films, Inc. v. Time Warner Entm't. Co., L.P.*,
   462 F.3d 1072 (9th Cir. 2006) ...............................................................6, 7

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)........................8

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999) .......................................................14

*Identity Arts v. Best Buy Ent. Servs. Inc.*,
   2007 U.S. Dist. LEXIS 32060 at * 52 (N.D. Cal. Apr. 18,
   2007) ..................................................................................................... 6, 17

*Klekas v. EMI Films, Inc.*,
   150 Cal. App. 3d 1102, 198 Cal. Rptr. 296 (1984).................................2

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) .......................................................... 7, 12, 13

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) .....................................................................9

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930)........................................................................13

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Olsen v. Nat'l Broad. Co.*,
  855 F.2d 1446 (9th Cir. 1988) ................................................2, 8

*Olson v. Tenney*,
  466 F. Supp. 2d 1230 (D. Or. 2006) ...........................................9

*Rice v. Fox Broadcasting Co.*,
  330 F.3d 1170 (9th Cir. 2003) .................................................17

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir. 1977) ...................................................8

*Thomas v. Walt Disney Co.*,
  2008 U.S. Dist. LEXIS 14643 (N.D. Cal. Feb. 14, 2008); *aff'd*
  2009 U.S. App. LEXIS 15056 at * 2 (9th Cir. July 8, 2009) ....................... passim

*Wainwright Securities Inc. v. Wall Street Transcript Corp.*,
  558 F.2d 91 (2d Cir. 1977).........................................................7

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir.), *cert. denied*, 476 U.S. 1159 (1986)....................2

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996).........................................................7

*Zella v. E.W. Scripps Co.*,
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) .......................................6

**Rules**

Federal Rules of Civil Procedure 12(b)(6)...................................21

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## **PRELIMINARY STATEMENT**

In this action, plaintiff Jordan Scott brings a claim of copyright infringement against the last book in Stephenie Meyer's enormously popular vampire *Twilight* series, *Breaking Dawn*, that is so lacking in support as to be sanctionable. Beyond ideas common to almost any love story, the only thing that plaintiff's novel, *The Nocturne*, has in common with Stephenie Meyer's *Breaking Dawn* is that each book involves vampires (although expressed differently). The stories are entirely distinct. So too are the characters. Indeed, Meyer's *Breaking Dawn*, the fourth book in the *Twilight* series, is the culmination of the series-long love story between Bella, a human, and Edward, a vampire, in which they marry, Bella gives birth to a part human-part vampire child and is herself transformed into a vampire to live with Edward forever. The story is set in present-day America where clans of werewolves and vampires coexist uneasily in modern society.

In stark contrast, plaintiff's short novel *The Nocturne* is billed as the first novel in a trilogy (yet to materialize). It is a fantasy story set in 14th-century France which draws on a full panoply of magical, paranormal, and horror elements. It focuses on the tragic love between Rainier and Annora, leading to Annora's death. Only in the last third of the novel is Rainier transformed into a vampire, thereafter embarking on a life of murder (that has no correlation in *Breaking Dawn*). Ultimately, *The Nocturne* ends with Rainier agreeing to fulfill an ancient prophecy by joining the forces of good in an epic battle against evil.

The complaint attaches a chart of comparisons between the two works which purports to show that the novels are substantially, even strikingly, similar. But as even a cursory review of the complaint, the chart, and the two works themselves reveals, *Breaking Dawn* and *The Nocturne* have nothing in common. If Scott's chart exhibits anything, it is a fundamental misapprehension of copyright law. Because the Copyright Act does not protect ideas, or the stock elements or so-called "*scenes à faire*" that necessarily flow from ideas or settings, plaintiff must show copying of

original "expression" of ideas.  Thus, in a case such as this, Scott must show that there is sufficient similarity of plot, themes, dialogue, mood, setting, pace, and characters, to contend that the works are "substantially similar."  Here, the court need only compare the two novels to conclude that, beyond stock elements associated with romance or vampire novels, there is no similarity at all between *The Nocturne* and *Breaking Dawn*.

At bottom, this lawsuit is a classic example of "that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any other which appear later must inevitably be ascribed to plagiarism."  *Klekas v. EMI Films, Inc.*, 150 Cal. App. 3d 1102, 1114, 198 Cal. Rptr. 296 (1984).  The simple reading of the respective works leads to but one conclusion:  the novels are not substantially similar.  Since this conclusion may be readily determined by the court as a matter of law, this Court should dismiss the complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    STATEMENT OF FACTS

### A.    THE TWO WORKS

On a motion to dismiss a copyright action for lack of substantial similarity in literary works, this Court need look only to the complaint, plaintiff's copyrighted work, and the allegedly infringing work.[1]  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51-52 (2d Cir.), *cert. denied*, 476 U.S. 1159 (1986) (cited in *Olsen v. Nat'l*

---

[1] A copy of defendant Meyer's book *Breaking Dawn* is identified as Exhibit A to the Request for Judicial Notice and Declaration of Andrew J. Thomas, and is being lodged separately with the Court because of its size.  A copy of plaintiff Scott's book *The Nocturne* is attached to the accompanying Request for Judicial Notice and Thomas Declaration as Exhibit B.  *Breaking Dawn* is cited hereinafter as "Meyer at __"; *The Nocture* is cited hereinafter as "Scott at ___."

On a motion to dismiss, the Court may consider documents whose contents are alleged in a complaint and whose authenticity no party questions.  *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994); *Thomas v. Walt Disney Co.*, 2008 U.S. Dist. LEXIS 14643 (N.D. Cal. Feb. 14, 2008); *aff'd* 2009 U.S. App. LEXIS 15056 at * 2 (9th Cir. July 8, 2009).  *See generally* Request for Judicial Notice at 1-2.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Broadcasting Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988); *Capcom Co. v. The MKR Group, Inc.*, 2008 U.S. Dist. LEXIS 83836, * 9-10 (N.D. Cal. Oct. 10, 2008).

1. ***BREAKING DAWN* BY STEPHENIE MEYER**

   a. **The *Twilight* Series**

As plaintiff herself alleges:

> Novels and popular representations of vampires have all been fashionable forms of entertainment since the late Nineteenth century. From Bela Lugosi to the most recent incarnation of a new Bella, various forms of the vampire story have been re-told over the years. The canon of vampire genre is well developed, especially as a particular form of young adult romance novels.

Plaintiff's Complaint ("Cplt.") ¶ 11.

In 2005, defendant Little Brown and Company, a division of Hachette Book Group USA, published a significant addition to the vampire genre, Stephenie Meyer's novel *Twilight*. *Id.* at ¶ 14. The story of the romance between Bella Swan and the vampire Edward Cullen was an instant success. In the following two years, defendants published two more novels in the series, *New Moon* (2006) and *Eclipse* (2007). The subject of this action, *Breaking Dawn*, was published in 2008 as the fourth and last book in the series. *Id.* The series describes Bella's move to Washington State in the present day United States, and her evolving relationships with two good friends – Edward Cullen, a vampire, and Jacob Black, a werewolf. The *Twilight* series proved particularly popular and has sold tens of millions of copies worldwide, is being made into a series of motion pictures, and has spurred a veritable industry of related publications, blogs, fansites, events, and associated merchandise.[2]

---

[2] Pursuant to Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice of facts such as these "that are generally known within the court's territorial jurisdiction" and . . . "that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Thomas*, 2008 U.S. Dist. LEXIS 14643, at *4-6, *aff'd*, 2009 U.S. App. LEXIS 15056, at *2-3.

### b. *Breaking Dawn*

*Breaking Dawn* is a 754-page book, with a richly textured, multi-layered plot and characters developed in the three prior books in the *Twilight* series (*Twilight, New Moon and Eclipse,* averaging 500-600 pages each).  Plaintiff does not challenge the pre-existing characters, plots, settings and themes fully realized in the first three books of the *Twilight* series.  Instead, plaintiff's claims rest only on the fourth book, *Breaking Dawn*, which concludes Bella's story, and Exhibit E to her Verified Complaint includes her "detailed analysis of *all* copyrighted infringement."  *See* Cplt., Ex. E (emphasis added).

*Breaking Dawn* is the final installment in the series and necessarily builds on the events and characters created in the first three books.  It is set entirely in present day Washington State.  As the book opens, Bella has already decided to marry the vampire Edward.  They marry, honeymoon and unexpectedly conceive a child whose accelerated development lends an urgency to the action.  Determined to have the child whatever the threat to her life, Bella accepts the protection of the Cullen clan while trying to defuse the jealous animosity of Jacob, the werewolf.  She gives birth to the half-human/half-vampire child, only surviving the ordeal by transition into a vampire.

The baby is named Renesme and, in a surprise twist, Jacob "imprints" on the baby and the ancient enmity between werewolves and vampires is cast aside.  Meanwhile, a vampire from a different clan, the Volturi, mistakenly reports that Renesme is an "immortal" (a permanent young vampire that is a threat to all vampires).  Bella draws on her new vampire skills and the support of other vampire clans to face down the Volturi, intent on destroying her daughter.  Ultimately, the Volturi conclude that the child is no threat, leaving Bella and Edward to enjoy their new life together.

MOTION TO DISMISS PLAINTIFF'S COMPLAINT
DWT 13429832V1 3930170-000020

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## 2.    *THE NOCTURNE* BY JORDAN S. SCOTT

In stark contrast to *Breaking Dawn*, *The Nocturne* is a 238-page medieval fantasy novel set in Southern France, the first book in a projected trilogy.  Cplt. ¶ 12.  It features a full cast of supernatural elements, including a witch, demons, a dragon, a magical amulet, futuristic machines, hellhounds, winged wolves, werewolves and vampires.  Rainier de Aaradyn, born in 1385, is an orphan raised by a witch in a rural village and estranged from his two brothers.  Rainier is the subject of some prophecy, and, early in the book, Rainier uses his magical powers to bring a maiden, Annora, back from the dead.  Against the opposition of her parents and the rest of the village, Annora and Rainier fall in love, but Rainier is forced to flee.  He seeks out his estranged brothers and uses his magic to cure the sick.  Along the way, he discovers a futuristic tomb, but a winged white wolf uses magic to erase all memory of it.  He is seized by a Baron Galtier who insists he cure his sick son, but the boy is a werewolf and Rainier kills him.

The angry Baron imprisons Rainier and when Annora comes to plead for his life, the Baron kills her.  Annora is carrying twins, a boy and girl.  The boy, Requiem, appears to survive.  Rainier is rescued from the dungeons by a vampire Von Sabre who also turns Rainier into a vampire.  For two years Rainier seeks revenge on humanity, terrorizing the countryside until he is taken by the white wolf to her king and persuaded to assist the wolves in protecting the Eternal Lamps from the forces of evil.  In a climactic scene, an ancient tomb collapses, Rainier discovers the nature of the prophecy, and he resolves to reform his evil ways.  In the final chapter, Rainier learns that his daughter is not dead after all and, as the book concludes, his brother announces that "Annora's grave is not the end for her" either.

## II.   ARGUMENT

## A.    THE APPLICABLE STANDARDS

To state a claim for copyright infringement, plaintiff must allege "(1) ownership of a valid copyright and (2) copying by the defendant of protectable

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

elements of the work." *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999). Where, as here, there is no direct evidence of copying, the second element of the test requires plaintiff to prove both defendants' "access" to the copyrighted work and "substantial similarity" of protected expression between the copyrighted work and the defendants' work.[3] *Chase-Riboud v. Dreamworks, Inc.*, 987 F. Supp. 1222, 1225 (C.D. Cal. 1997). Because defendants do not raise access as an issue at this juncture, plaintiff's claim must be dismissed if, as a matter of law, no reasonable jury could find plaintiff's and defendants' works substantially similar in their expression. *Funky Films, Inc. v. Time Warner Entm't. Co., L.P.*, 462 F.3d 1072, 1076-77 (9th Cir. 2006).

No factual record is required for this Court to compare the two books and determine whether there is similarity of protected expression. For this reason, courts in this and other circuits readily dispose of claims on motions to dismiss on a determination of a lack of substantial similarity.[4]

---

[3] To prevail at trial, plaintiff must prove **both** that *Breaking Dawn* is substantially similar to protectable elements of *The Nocturne* **and** that defendants had access to plaintiff's work, *i.e.* a reasonable opportunity to view or copy it prior to writing *Breaking Dawn. Chase-Riboud*, 987 F. Supp. at 1225. While access is not at issue on this motion, defendants note that they had never heard of plaintiff or her book before this lawsuit was filed and, should this Court deny the instant motion, they will vigorously dispute access. *The Nocturne* was first published in 2006, though plaintiff claims that she began work on her novel in 2003 and posted some material on her website. *See* Cplt. ¶ 18. *Breaking Dawn* was not published until 2008, but it was written between 2004 and 2006, before the first three books in the *Twilight* series were written and published. *Id.* ¶¶ 16 & 17 and Ex. B (*Breaking Dawn* Copyright Office pre-registration). Further, much of the allegedly infringing material in *Breaking Dawn* appears first in an unpublished novel by Meyer titled *Forever Dawn* which was registered with the Copyright Office in 2004, well before the publication of plaintiff's novel. Moreover, because there is no substantial similarity of protectable elements between *The Nocturne* and *Breaking Dawn*, Scott may not avoid her burden on access by instead establishing that the works are so "strikingly" similar that access can be inferred, a much higher standard.

[4] *See, e.g., Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130-31 (C.D. Cal. 2007) (granting motion to dismiss on lack of substantial similarity); *Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd.*, 697 F. Supp. 1136, 1137, 1145 (E.D. Cal. 1987) (same); *Identity Arts v. Best Buy Ent. Servs. Inc.*, 2007 U.S. Dist. LEXIS 32060 at * 52 (N.D. Cal. Apr. 18, 2007) (same), *aff'd*, 2009 U.S. App. LEXIS 6707 (9th Cir. Apr. 1, 2009); *Thomas*, 2008 U.S. Dist. LEXIS 14643 at * 17 (same), *aff'd*,

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

The Ninth Circuit employs an extrinsic/intrinsic analysis to test for substantial similarity. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). The extrinsic component tests for similarity of ideas and expression based on objective external criteria, whereas the intrinsic component tests for "similarity of expression from the standpoint of the ordinary reasonable observer" – a subjective test. *Id.* (citation omitted). The intrinsic test is for the jury only, but because a plaintiff must ultimately prove infringement under both tests, the Court may dismiss a complaint under the extrinsic test alone. *Funky Films*, 462 F.3d at 1077. In the context of works of fiction, the extrinsic test "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in [the] two works." *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). Because in both the extrinsic and intrinsic tests the court "must take care to inquire only whether the *protectable elements, standing alone*, are substantially similar," it will filter out and disregard non-protectable elements in making a substantial similarity determination. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (emphasis in the original) (*quoting Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). Thus, there are certain fundamental principles which must be applied at the outset to filter out certain alleged similarities.

First, it is "universally understood" that facts are not copyrightable no matter how "scrupulously researched." Cplt. ¶ 14; *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 344, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991). Indeed, the universe of protectable expression in novels based in any way on historical fact is highly circumscribed, and is limited to only "the author's analysis or interpretation of events, the way he structures his material and marshals facts, [and] his choice of words…" *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95-96 (2d Cir. 1977).

---

2009 U.S. App. LEXIS 15056 (2009); *Capcom*, 2008 U.S. Dist. LEXIS 83836 at *33-34 (same, dismissing counterclaims).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Second, "[i]t is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) ("[N]o author may copyright facts or ideas.").

Finally, copyright law excludes "[f]amiliar stock scenes and themes that are staples of literature" – scenes-à-faire, the ideas or scenes that flow naturally from other ideas or basic plot premises or scenes. *Cavalier*, 297 F.3d at 823; *accord Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) (no protection for idea of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and a young professional who investigates and exposes the criminals); *Olsen v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988) (common ideas, such as a "group action-adventure series designed to show Vietnam veterans in a positive light," are unprotectable).

## B.  PLAINTIFF HAS FAILED TO ALLEGE LITERAL COPYING

Scott alleges *inter alia* that defendants copied the "essential language" of *The Nocturne* and attaches to her complaint a chart of quotations, which is described as "a comparative analysis of the striking, articulable and substantial similarities between the two books."  Cplt. ¶ 22 and Ex. E.  However, a review of the chart reveals that there are absolutely no literal similarities indicative of copying. [5]

There are no identical phrases, no unique phrases or unusual vocabulary, no similar paragraph construction, and no sequence of expressive elements that evidence *any* literal copying.  The few linguistic similarities that exist are not protectable because they are ubiquitous and flow necessarily from the scenes and common plot

---

[5] On a motion to dismiss, the Court may consider documents attached to the complaint.  *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994); *Thomas*, 2009 U.S. App. LEXIS 15056 at * 2.

8

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

elements.  For example, it is hardly unique to have white flowers decorating an arch at a wedding, or descriptions of the honeymoon as "perfect" or the bride as "beautiful," or lovers who call one another "love" and promise their love will last "forever" or have arms "wrapped around" each other.  There in nothing original in expecting mothers who look at their "stomach" and "count" down the days to full term, who draw the father's attention to the baby "kicking," and who discuss possible "names" together.[6]  Most parents claim their newborn is "beautiful" or "perfect" and their eyes become "bleary" or "blurry" with joy when they cry.  Similarly, there are countless stories of the death of a literary character which include references to difficult "breathing," blood "pooling" or "dripping" around the body as the heart continues to "beat," encroaching "blackness," limbs gradually turning limp while their companion applies mouth-to-mouth resuscitation, and there is despair at the loss of a loved one.  None of these common scenes are original or unique to any one literary work, and there would be few new books, movies and television shows if a single author could claim exclusive ownership of such phrases.  *See* Cplt. Ex. E. *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) (random words, commonly-used expressions, ordinary phrases and stereotypical descriptions such as "crawling with alligators" and "mosquitoes ravished his flesh" are not protectable).  Scott even has the temerity to claim copyright protection for the language of the traditional marriage vows which date back to the sixteenth century.  *Olson v. Tenney*, 466 F. Supp. 2d 1230, 1237 (D. Or. 2006) (identical phrases taken from the Book of Esther in the Bible in two works not actionable).

---

[6] Scott appears to claim that the name of the child in *Breaking Dawn* – Renesmee – is further evidence of copying (Scott's child is named Requiem).  Not only are the names patently dissimilar (sharing only the first initial) but, as the very passage cited by Scott in her chart makes clear, Renesmee is an amalgamation of "Renee," Bella's mother, and "Esme," Edward's adoptive mother.  Requiem, in stark contrast, is associated with religion.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Furthermore, to the extent that Scott claims protection for specific passages describing a wedding, honeymoon sex, nightmares, conversations between a husband and wife about her pregnancy and the sex and name of the child, the process of becoming a vampire and mourning the loss of human characteristics, and so on, the expression of the actual language used, particularly in context, is entirely distinct. There is no legal basis for plaintiff to claim that general similarities between common phrases or generic scenes constitute "striking" examples of copying. Consider the following examples cited by plaintiff:

(1)  A particular moment between two lovers:

There was silence.  It could have been no more perfect. (Scott at 137)

The moment was so perfect, there was no way to doubt it. (Meyer at 85)

Cplt. Ex. E at 2.

(2) two lovers lying together after sex:

My leg rested on hers, and I moved it back and forth, still tempting her.  Lying with my chest to her back I kissed her neck, being slightly mischievous as I slid my fingers down her stomach and onto her legs. (Scott at 143)

His fingers trailed down the contours of my spine, and I knew that he knew I was awake.  I kept my eyes shut and tightened my arms around his neck, holding myself closer to him. (Meyer at 86)

Cplt. Ex. E at 3.  Not only are the passages told from different viewpoints (Scott – the man; Meyer – the woman), but they take place at different times of day (Scott – at night; Meyer – middle of the day) and there is no commonality between the physical configurations of the characters (Scott – back-to-back; Meyer – front-to-back), between their actions (Scott – prelude to more sex; Meyer – sated after sex) or reactions (Scott – none; Meyer – hugging closer) or between their mood (Scott – mischievous; Meyer – intimate).  Indeed, the only significant words these passages have in common are "perfect" "fingers" and "neck."  Within the voluminous literary descriptions of lovers lying together, these examples could hardly be less alike.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

In short, each of the cited examples of "striking" or "substantial" literal similarities is either a classic *scene à faire* and the common currency of romance and vampire literature or is expressed entirely differently. It is clear that plaintiff strains to cherry-pick various moments of superficial similarity between the two books and then improperly cites them as examples of substantial or even striking similarity. A simple review of the passages in context reveals that in each instance the expression is completely different, even within the constraints of similar subject matter. These "similarities" cannot provide a legal basis for literal copying.

**C.    NONE OF THE ALLEGEDLY SIMILAR ELEMENTS ARE PROTECTABLE AND, EVEN IF THEY WERE, THEY ARE DISSIMILAR IN EXPRESSION**

Scott's claim is no more availing when you consider a comparison of the two books in terms of plot, themes, dialogue, mood, setting, pace, characters or sequence of events. In every one of these respects the novels are remarkably different, and to the extent they share any similarities at all they are stock elements of the Fantasy/Romance/Vampire genres or flow naturally from them. There is no substantial similarity, much less striking similarity, of copyrightable elements.

**1.    Plot and Themes**

As the description of *Breaking Dawn* and *The Nocturne* (*supra* pp. 2-5) makes abundantly clear, there is nothing remotely similar about the plots of the two books. *Breaking Dawn* is a richly realized story of a modern day young woman falling in love with a vampire, their marriage, the birth of a half-vampire baby, and her transition to a vampire. *The Nocturne* is a medieval story of typical star-crossed lovers, with a young man who has magical powers and a prophetic future. Only after his wife dies a violent death is the man transformed into a vampire, over 260 pages into the story. Even then, he ultimately renounces his evil-vampire ways and joins forces with a magical white wolf and her king to destroy evil in the world.

The plots of the two novels have nothing in common, either in their elements or their sequence of events, other than the abstract (and unprotectable) idea of a

11

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

young couple who marry, suffer in the birth of their child, and face elements of the supernatural. *See Cavalier*, 297 F.3d at 824 (no protection for the shared "premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep"); *Thomas*, 2008 U.S. Dist. LEXIS 14643, at * 10 (no protection for shared idea of a story about "young fish in the ocean that are captured by divers and put in a fish tank"); *Berkic*, 761 F.2d at 1293 (no protection for similar idea for a book where "criminal organizations [] murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants.").

In *Breaking Dawn*, Bella lives to spend eternity with her vampire husband, having given birth to a half-human/half-vampire child. The action revolves around the ancient enmity of werewolves and vampires, and vampire clans at odds with each other. *The Nocturne*, in contrast, features a sorcerer who develops magical powers, the murder of his wife, and the fulfillment of a prophecy that stretches back to ancient times. Although wolves (winged wolves but not werewolves/shapeshifters) and vampires appear in *The Nocturne*, they are but two in a menagerie of magical and supernatural phenomena, which include demons, a dragon, and hellhounds.

The plot and thematic developments Scott identifies in support of her substantial similarity claims are impermissibly cherry-picked from disparate parts of the book. *Kouf*, 16 F.3d at 1045-46 (criticizing plaintiff's "compilation of random similarities scattered throughout the works, such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight"). More important, they are entirely common to the genre and therefore unprotectable in copyright.

*The Nocturne* employs many of the clichés of romance literature over which Scott may impose no monopoly. Scott surely cannot claim protection for the plot device of a wedding, or a honeymoon, or pregnancy, or the general themes of young lovers facing obstacles to their happiness or sacrifice for the sake of their child. The

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

common trappings of weddings, with flowers, groomed hair, gathered friends, the walk down the aisle, the betrothed meeting at the altar and the speaking of wedding vows are all so ubiquitous that they have become classic *scenes à faire*.  Similarly, stock scenes in which the newlyweds make love on a beach in the moonlight, prepare for the birth of their child by debating the baby's sex and name, talk to the fetus and feel it kick, are the common currency of such literature and follow logically from the unprotectable idea of a marriage.  *Berkic*, 761 F.2d at 1294 ("depictions of the small miseries of domestic life, romantic frolics on the beach . . . are among the very staples of modern American literature and film" and hence unprotectable); *Kouf*, 16 F.3d at 1045 (general plot ideas such as "a life struggle of kids fighting insurmountable dangers" not protected by copyright law); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 463  (11th Cir. 1994) (sequence of events are unprotectable scenes a faire because "all works involving courtship and marriage will feature a wedding"); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (a quarrel between families of different ethnicities and religions, the marriage of their children, the birth of grandchildren and a reconciliation are scenes not protected by copyright law).

Moreover, even within the strictures of such common life events and literary tropes, the expression of those plot developments and themes in the two works is completely different.  For example, in *The Nocturne* the wedding, which doesn't occur until half way through the book, takes place before the assembled French village on a breezy hill above the ocean, whereas in *Breaking Dawn* it occurs at the beginning of the book inside the Cullen family Washington State home before family and friends.  *The Nocturne* wedding is played for its full romantic effect and goes off without incident in one and one half pages, whereas Bella's day lasts for thirty-seven pages and bears all the hallmarks of a modern wedding with its moments of humor and family farce – the garter, the thrown bouquet, the first dance.  In contrast to the idyllic scene depicted by Scott, Bella's wedding is full of contradictions and ironies –

13

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the normalcy of the event is constantly undermined by Bella's commitment to abandon normal life to become a vampire, and the reception is noteworthy for the disruptive return of Edward's rival, Jacob Black.

Similarly, in *The Nocturne* Rainier's concerns in the beach sex scene arise from his bride's virginity; in *Breaking Dawn* Edward fears hurting Bella because of his supernatural vampire strength.  Even the traumatic childbirths that Bella and Annora each face could not be more radically different.  Bella is in the safety of the Cullen home, but she has chosen to give birth to what many fear is a monster.  Bella survives the birth, but is transformed into a vampire.  The threat to her is entirely from the child within.  Annora, on the other hand, is in a medieval prison where she is stabbed to death by the Baron while bearing human twins.  Whether from her stab wound or Rainier's efforts to extract the baby, the threat to Annora is from without.

Vampire literature has almost as rich and extensive a pedigree as romance.  As plaintiff alleges, "[t]he canon of vampire genre is well developed, especially as a particular form of young adult romance novels."  Cplt. ¶ 11.  The need to "hunt" to acquire blood, immortality, heightened senses and superhuman strength are common to almost every vampire story ever written and are beyond copyright protection.  *See Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310-11 (S.D.N.Y. 1999) (in two works that involve the unprotectable idea of a half-vampire character who is on a quest to discover his origins, unprotectable ideas and themes that flow therefrom include a sinister genealogy, a struggle between good and evil, indoctrination into the forces of evil by killing, and the use of blood imagery and religious symbolism); *Capcom*, 2008 U.S. Dist. LEXIS 83836, at * 25-26 (no protection for idea of zombies in a shopping mall unless zombies are distinctive).

Even still, the expression of vampirism in the two books could not be more different.  In *The Nocturne*, Rainier's transformation comes late in the book and drives only a small part of the plot; for example, his being a vampire is somehow lost in the story as he returns to doing good and is not even mentioned in the climactic

MOTION TO DISMISS PLAINTIFF'S COMPLAINT
DWT 13429832V1 3930170-000020

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

scenes in the tomb.  When he is transformed, he becomes the classic blood lusting vampire murderer on the model of Dracula and Nosferatu, indiscriminately terrorizing the populace, in stark contrast to his powers as a sorcerer which he had only used for the good.  *Breaking Dawn,* on the other hand, builds throughout the series on an entire world of vampires.  Vampires, including the Cullen clan, have long learned to pass successfully as modern-day humans and repress traits associated with traditional vampires.  To maintain their "passing" status they hunt and feed sparingly and take only what they need.  *Thomas*, 2008 U.S. Dist. LEXIS 14643, at * 12 (no substantial similarity when primary plot event of fish character's capture occurs only at the final climax of one story but early in the plot of the other).  There is no sense that vampirism is the embodiment of evil as it is in *The Nocturne* – indeed much of the plot derives from Edward's decency and restraint in the face of Bella's (human) stubbornness and Jacob's (werewolf) anger.

In short, the plot elements and themes that Scott claims are infringed are common ideas, *scenes à faire* or literary devices that are not entitled to copyright protection.  The expression of each of these elements is entirely different in the two books.

## 2.    Settings and Character

The settings and characters in the two books are even more distinct.  *The Nocturne* is set in a fantasy medieval France complete with grim castles and picturesque villages, barons and serfs, carts, farm animals and faithful steeds.  Board-hewers wander the forests; witches live among the villagers; superstition and faith rule daily life.  The climactic scene takes place in an ancient tomb in snow-covered mountains, "neither rock, nor tree, nor path in sight."  (Scott at 325).  *Breaking Dawn* takes place in the present-day Pacific Northwest.  It is a place of dead-end towns and redwood forest; bikers, trucks and police cruisers; ultrasounds and X-rays.  The honeymoon scene takes place on a private island off the coast of Brazil, and the

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

climactic scene with the Volturi is set in a clearing in a dense forest. The settings in these two books have absolutely nothing in common.

Other than the fact that both books include a vampire male protagonist, the characters have nothing in common. Rainier is a young man of dashing good looks ("charming and charismatic, strong and slightly rugged-looking"), determined to do good with his magical powers, who transforms into a vampire late in the book and is led into evil before resolving to fight to restore goodness to the world. He first appears as a somewhat naïve caricature, overly trusting of others and ignorant of his magical powers. The trauma of his torture and Annora's murder unleashes his inner demons and he becomes capable of cruelty and terrible violence. Ultimately, he realizes that he will play a key role in the forthcoming battle between the forces of good and evil. The male protagonists in *Breaking Dawn*, however, are rough and determined from the start – Edward the archetypal brooding dark vampire, but with a heightened sense of social responsibility to his clan and others around him; Jacob (for whom there is no equivalent in *The Nocturne*), the hot-headed biker who struggles to control his anger for Bella's sake. In contrast to Bella's determination, Edward seems paralyzed with indecision and guilt throughout much of the book.

The female protagonists are no more similar. *The Nocturne*'s Annora is a medieval vision of loveliness, modest but also courageous, fine-featured and fair-skinned, perfect in every way. She is not afraid to face up to her parents and the Baron to be with her adored Rainier. She can be coy, but the emphasis is on her girlish purity throughout. *Breaking Dawn*'s Bella is a more modern heroine, always ready with a quip, spunky and emotional, sure of what she wants and prepared to dig in her heels to get it. She expresses frustration with Edward's and Jacob's protectiveness and rivalry. Once transformed to being a vampire, she revels in her new powers and exotic looks. She shows flashes of anger. A good example of their differences is in a passage cited in Scott's chart for evidence of substantial similarity: As Annora lies dying she implores Rainier:

16

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1

> "My last wish. I ask this," she said: "save Requiem, save our baby."

2

> "I can't."

3

> "For me, do it for me. Please, whatever you must, do it now so he will have a chance."

4

5  Scott at 229. Bella's tone could not be more different:

6

> Somewhere in this, Bella came around. She responded to their words with a shriek that clawed my eardrums. "Get him OUT" she screamed. "He can't BREATHE! Do it NOW!"

7

8  Meyer at 349. Cplt. Ex. E at 8.

9

10      To the extent the principal male characters in both books show strength, courage, occasional sensitivity, and superhuman abilities, or the female characters the capacity for love, self sacrifice and determination, such traits are too general and ubiquitous to the genre to be protectable. *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003) ("while there may exist similarities between the magician 'characters,' any shared attributes of appearance and mysterious demeanor are generic and common to all magicians").

11

12

13

14

15

16      Finally, the subsidiary characters in *The Nocturne* are too summarily sketched to be distinctive and/or have no equivalent in *Breaking Dawn*. We know next to nothing about Requiem who, unlike the fast maturing and gifted Renesmee, barely reaches toddlerhood by the end of the book. Baron Galtier and Von Sabre are classic villains without parallels in *Breaking Dawn* for plot function or character traits. We are not told enough about Rainier's brothers to determine if they share traits with members of Edward's family, and even if they did, their role in the plot is entirely dissimilar. Finally, the deftly drawn portraits of Bella's parents have nothing in common with the little we know about Annora's parents whose only plot function is to drive Annora from her home. *See Capcom,* 2008 U.S. Dist. LEXIS 83836, at * 23-26 (stock characters and characters lacking in distinctive character traits found not protectable); *Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at * 42-44 (presence of

17

18

19

20

21

22

23

24

25

26

27

28

17

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

large numbers of ill-defined characters or characters without parallel in the two works undermines substantial similarity).

### 3.    Pace, Mood and Dialogue

The above quotations are also a good example of the deep difference in pace, mood and dialogue between the two works. *The Nocturne* lurches from a rosy-hued world of purity, innocence and child-like emotions to acts of extreme violence in a heart-beat. Its pace is uneven and the action is confused, drawing on every cliché of the genre (collapsing stone temples, magical amulets, attacks by demon skulls with glowing red eyes). *Breaking Dawn*, in contrast, presents a stable world where unnatural beings in the form of vampires and werewolves have learned to live among humans with seamless normality. As if to reflect this normalcy, the action builds slowly and follows logically to its conclusion. *Capcom*, 2008 U.S. Dist. LEXIS 83836, at * 30 (contrasting variable pace of zombie movie with constant pace of zombie video).

Literary devices, employed very differently in the two books, reinforce this difference in pace. *The Nocturne* cuts frequently (and confusingly) between locations and characters, in one chapter following Rainier, in another Annora, in another his brothers, in another Von Sabre, etc. Frequently, too, these cuts indicate a switch in voice, the first person narrative taken up by the character whose name appears at the chapter head. Scott also fragments the narrative flow by revealing key plot in flashbacks or later conversations, such as Lucan's narrative in Chapter 5, Von Sabre's in Chapter 20, or Mathius's in Chapter 27. In *Breaking Dawn*, by contrast, the action tends to follow smoothly from chapter to chapter with spatial logic and in chronological order. This flow is facilitated by telling the 750-page story from only two points of view – Bella in Book One and Book Three and Jacob in the 220-page Book Two.

The books also end on a very different note. *The Nocturne,* the first book in a series, ends with Rainier persuaded to fulfill the prophecy and take a leading role in

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the forthcoming war between the forces of good and evil over the Eternal Lamps. Many questions remain unanswered, but it is clear that there will be more violence and drama on a cataclysmic scale before the trilogy is resolved. Despite the hopeful last line of the book, it is not evident if the murdered Annora will reunite with Rainier or what role she will play in coming events. In contrast, *Breaking Dawn* is the last book in the *Twilight* series and its ending is one of peace and resolution. With the departure of the Volturi, doubts about Renesmee allayed, and Bella enthusiastic about her new powers, Bella's happiness with Edward and Renesmee appears assured. Fittingly, the novel ends with the vampire equivalent of riding off into the sunset: "And then we continued blissfully into this small but perfect piece of our forever."

The dialogue in *The Nocturne* is as stilted and awkward as the plot, veering from some sort of literary pseudo-medievalism ("What ails him?" (174); "I am with child." (153)) to the most modern anachronisms ("Come off it." (161)). The characters often speak in superlatives or banalities, far removed from real conversation.

> She twirled a lock of my hair around her finger, and did all she could to hold back her tears. "How do you know we will see each other again?"
>
> I placed my finger on her lips to hush her. "There is no sacrifice too great for love. Remember that. I'll find a way."
>
> "But what if you don't? I cannot go on without you . . ."
>
> "Don't you have any faith in me? I asked.
>
> "Yes, but I'm afraid."

Scott at 71. In *Breaking Dawn*, however, the language is sassy, humorous and believable in keeping with the contemporary setting and well-developed characters.

> "You're scared of *Leah*, but you're best buds with the psychopath blondes?"
>
> There was a low hiss from the second floor. Cool, she'd heard me.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Meyer at 247.  Another example of an allegedly infringing passage from Scott's chart of comparisons shows the contrast in language:

> Most days she sat by the hearth for hours, knitting clothes and blankets for him; while, all this time she would talk to him so that he would hear her voice, and know how deeply he was loved. (Scott at 156)

> Edward, very lightly, put both of his hands against her huge, round stomach. "The f-." He swallowed.  "It . . . the baby likes the sound of your voice." (Meyer at 325)

In sum, it is clear that there are no similarities of protectable expression in the plot, sequence of events, themes, setting, characters, mood, pace, or dialogue in the two works.

### 4.    Total Concept and Feel

Although this Court may dismiss Scott's claims on this extrinsic analysis alone, under an intrinsic analysis the result would be the same.  The intrinsic test is subjective and looks to the total concept and feel of the two works from the viewpoint of the ordinary reader.  *Apple Computer*, 35 F.3d at 1442.

*The Nocturne* is a romp through almost every cliché of paranormal romance.  At times sweet, at others funny, at others terrifying, *The Nocturne* employs sorcery, witches, ancient myths, werewolves, winged wolves, a dragon, vampires, hellhounds and futuristic machines, all in a picturesque medieval setting.  In using such a wide range of paranormal elements, *The Nocturne* establishes an unprotectable, magical kingdom in which the lead characters appear powerless to determine their own fate.  It is a fantasy love story, certainly, but the lovers are also actors in a larger story of the timeless struggle between forces of good and evil.  As the book ends, the climactic battle is just beginning.  *Breaking Dawn*, on the other hand, is the culmination of a four-book love story in a much more focused world.  By limiting the paranormal to vampires and werewolves and embedding them firmly as outsiders in modern-day American society, *Breaking Dawn* creates a believable context in which the romance between a human and a vampire is the central subject of the book.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Written in a confessional and contemporary style, it appeals particularly to young adults who see in Bella's attraction to a vampire – an outsider in a human world – an echo of their own feelings of alienation and self-discovery.  The total concept and feel of the work, therefore, is completely dissimilar to that of *The Nocturne*.[7]

## CONCLUSION

For the reasons set forth above, the complaint should be dismissed with prejudice for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6).

DATED: October 8, 2009

DAVIS WRIGHT TREMAINE LLP
ELIZABETH A. MCNAMARA
ANDREW J. THOMAS
CHRISTOPHER J. ROBINSON


By: _____/s/Andrew J. Thomas_____
Andrew J. Thomas

Attorneys for Named Defendants

---

[7] In addition to direct copyright infringement, Scott alleges that all the defendants induced, encouraged and assisted as yet unnamed individuals and entities in the copying and distribution of *Breaking Dawn* and are therefore liable for contributory and vicarious copyright infringement.  Not only has Scott failed to allege *any* facts with respect to these unnamed and unidentified parties, which alone constitutes grounds for dismissal, but there can be no secondary copyright infringement without an underlying direct infringement. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 n. 2 (9th Cir. 2001).  As set forth herein, no reasonable juror could find *Breaking Dawn* substantially similar to *The Nocturne* in its protected expression, hence the secondary liability causes of action should also be dismissed.

MOTION TO DISMISS PLAINTIFF'S COMPLAINT
DWT 13429832V1 3930170-000020

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899